UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| Team Systems International, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>AQuate Corporation,<br><br>Defendants. | **VERIFIED COMPLAINT**<br><br>Case No. 1:13cv111<br>GBL/TCB |

## VERIFIED COMPLAINT

Plaintiff Team Systems International, LLC ("TSI"), by counsel, respectfully states as follows for its Complaint against Defendant AQuate, Corporation ("AQuate").

### NATURE OF ACTION

1. This is an action for breach of contract, tortious interference with a contract, and defamation, arising out of the unlawful termination of a subcontract between TSI and AQuate and the actions of AQuate relating thereto.

### JURISDICTION AND VENUE

2. Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332 because Plaintiff is a resident of a different state than Defendant and because the value of the matter in controversy exceeds $75,000.00.

3. Personal jurisdiction and venue in this district are proper pursuant to 28 U.S.C. § 1391 because Defendant has agents in, and/or transacts its business and affairs in, this district, and (ii) a substantial part of the events or omissions giving rise to the claims for relief

1

occurred in the Eastern District of Virginia. The AQuate Corporate Manager for the contract at issue in this Complaint resides in this district and has attended meetings with TSI staff at the United States Navy's Military Sealift Command ("MSC") Headquarters.

4. Separate and apart from the foregoing statutory bases is the fact that MSC, the relevance of which is outlined below, is headquartered in Washington, DC. Given that Plaintiff TSI plans on eliciting testimony from numerous MSC representatives at trial, it would be overly burdensome for such representatives to leave their post and be directed to an alternative jurisdiction and venue.

## PARTIES

5. Plaintiff TSI is a limited liability corporation organized under the laws of the State of Delaware. The principal place of business of TSI is located at 11921 Freedom Drive, Suite 550, Reston, Virginia 20190.

6. Defendant AQuate is a corporation organized under the laws of the State of Alabama. The principal place of business of AQuate is located at 7800 Madison Boulevard, Suite 206, Huntsville, Alabama 35806.

## FACTS COMMON TO ALL COUNTS

### The TSI-MSC Relationship

7. From its offices here in Northern Virginia, TSI provides public and private entities with a broad spectrum of specialized development, management and project/structured finance services. TSI has an extensive range of expertise in the fuel and chemicals sector, providing worldwide acquisition, financing, logistics, transport, and security assistance. Additionally, TSI provides consulting support in the form of:

- Energy and environmental strategic planning;

- Capital needs assessment;

- Distributed energy management;

- Executive decision support services, executive decision support reporting and risk management;

- Project management and administration support;

- Performance benchmarking, measurement and verification support;

- Risk management reporting;

- Energy and operations surveys;

- Metering and load profiling;

- Energy conservation measures and renewable energy assessments;

- Technical data package and procurement support services;

- Utility aggregation and procurement strategies; and

- Utility services billing and administration.

8. As a result of its extensive experience in providing security assistance, TSI enjoys a close relationship with the MSC.

### The SBX-1 Solicitation

9. On March 7, 2012, MSC issued Solicitation No. N00033-12-R-2000 for the SBX-1 effort. Therein, MSC required that competitors for the resulting prime contract were limited to Small Business Administration ("SBA")-certified 8(a) entities.

10. In early April 2012, TSI was approached regarding an impending opportunity for security support services on an MSC vessel (the "SBX-1"). Given TSI's expertise in the security services sector, particularly with respect to the securing of open-sea vessels, it was suggested that TSI was ideally positioned to support this effort

11. TSI proposed to AQuate to use its expertise and experience in conjunction with AQuate's 8(a) status to enter into a teaming agreement with AQuate, which contemplated that the parties would collaborate to secure Prime Contract #N00033-12-C-2000 (the "Prime Contract") and, where the parties were successful in doing so, AQuate, as an American Indian Tribal ("AIT") owned, SBA Small Disadvantaged Business ("SDB") certified 8(a) business, would perform the Prime Contract and subcontract the transition planning and staging activities and 49% of the operations labor and support required thereunder to TSI, a Native American Small Business.

12. On August 17, 2012, AQuate was awarded the **Exhibit A** Prime Contract.

13. The Prime Contract incorporated in full AQuate's proposal as Attachment L to Section J.

14. AQuate's proposal included in Section 6 a list of key ship-based personnel it proposed to staff the SBX-1, attached hereto as **Exhibit B**. This personnel list identified proposed personnel, their level of clearance, and the company for which the personnel would be working:

| Personnel | Security Clearance |
|---|---|
| William Clark - AQuate | Secret |
| **Cliff Bruner – TSI** | **TS-SCI** |
| James Kesi – TSI | TS-SCI |
| Steven Acosta – TSI | TS-SCI |
| Robert Gibson - AQuate | TS |
| Christopher Derbak - AQuate | TS |
| Raymond Roddy III – TSI | Secret |
| Anthony Michaux - AQuate | Secret |
| **Jonathan Taft – TSI** | **Secret** |
| Paul Khoshaba - AQuate | Secret |
| Carlos Hernandez - AQuate | Secret |
| Ian Clouthier - AQuate | Secret |
| Brent Kase – TSI | Secret |
| **James Barlow – TSI** | **Secret** |

4

| Mike Martin - AQuate | Secret |

### Industrial Security Requirements

13. Shortly after the Prime Contract award, on August 23, 2012, AQuate received the **Exhibit C** Form DD-254, Contract Security Classification Specification, from MSC, outlining the classified information to which the contractor would require access and providing security classification guidance. The DD-254 stated that "[i]f subcontractors are used, th[e] form must be modified to include subcontractor information. The contractor will ensure all subcontractors follow security guidance." *See* Ex. B at 2.

14. Section C.3.9 of the Prime Contract incorporated the National Industrial Security Program Operating Manual ("NISPOM"), which provides baseline standards for the protection of classified information released or disclosed to industry in connection with classified contracts. *See* Dep't of Defense, DoD 5220.22-M (2006) [hereinafter *NISPOM*].

15. Under the Prime Contract, the contractor is required to have a SECRET facilities clearance ("FCL"), which is an administrative determination that a company is eligible for access to classified information or award of a classified contract.

16. As detailed in Chapter 2, Section 1 of the NISPOM, a contractor or prospective contractor cannot apply for its own FCL; it must be sponsored by a currently cleared contractor or a government contracting activity ("GCA"). However, contract award may be made prior to the issuance of an FCL.

17. To be eligible for an FCL, a company must: (1) need access to classified information in connection with a legitimate U.S. government requirement; (2) be organized and existing under the laws of any of the fifty states, the District of Columbia, or Puerto Rico, and be located in the United States or its territorial areas; (3) have a reputation for integrity and

lawful conduct in its business dealings, and not be barred from participating in U.S. government contracts; and (4) must not be under foreign ownership, control, or influence ("FOCI"). *See NISPOM*, § 2-102.

18. The NISPOM places certain responsibilities on the prime contractor with regards to disclosure of classified information to subcontractors. When a prospective subcontractor does not have the appropriate FCL for a contracting opportunity, the prime contractor "shall request the [Cognizant Security Agency] of the subcontractor to initiate the necessary action." *Id.* § 7-101(b)(2). Furthermore, "[r]equesting contractors shall allow sufficient lead time in connection with the award of a classified subcontract to enable an uncleared bidder to be processed for the necessary FCL." *Id.* § 7-101(c).

19. In addition to possession of a SECRET FCL by the contractor, the Prime Contract required that all contractor security officers employed under the Prime Contract possess SECRET Personnel Security Clearances ("PCLs") prior to assignment to the SBX-1 vessel.

### The AQuate-TSI Subcontract

20. On August 28, 2012, TSI entered into the **Exhibit D** Subcontract Agreement (the "Subcontract") with AQuate, under which TSI agreed to provide the necessary personnel, facilities, and materials to perform the work in the Statement of Work ("SOW")[1] in exchange for a firm-fixed price ("FFP") amount.

---

[1] The Prime Contract referred to the provisions of the Prime Contract describing the work to be performed thereunder as the "Performance Work Statement" or "PWS." Because the Subcontract referred to these provisions as the SOW, the term SOW shall be used throughout this Verified Complaint.

21. Payment under the Subcontract would depend on whether the SBX-1 is operating in Limited Test Support Status ("LTSS") or in an Underway Scenario, in which case Security System Level A ("SSL-A") requirements would apply.

22. The Subcontract provided that TSI would be paid $44,191.99 FFP for transition services, plus air travel and nine days of per diem at the Outside of the Contiguous United States ("OCONUS") rates for TSI employees. Air travel and OCONUS per diem were reimbursable with contracting officer approval.

23. The Subcontract further provided that TSI would be paid $3,082.66 per day when the SBX-1 was operating at LTSS status. When the SBX-1 was in fully operational status, TSI would be paid $5,827.82 per day.

24. Pursuant to Section B.7 of the Subcontract, "[AQuate] shall make all timely payments specified in the Schedule of Payments that is identified in SECTION J –Payment and Schedule Terms."

25. Attached as Exhibit D in Section J and incorporated into the Subcontract was a Schedule of Payments detailing the amounts for which payment to TSI was required and the specific dates upon which said payments were due. Such Schedule of Payments is attached as **Exhibit E**.

26. As noted in Section G.2, in exchange for the terms of this Schedule of Payments, TSI waived a previously agreed upon option to have AQuate use a commercial bank cash management lockbox to disburse all payments received under the Prime Contract.

27. Pursuant to the Subcontract, TSI was to provide employees possessing PCLs to perform security officer services upon the SBX-1 in accordance with the SOW.

28. TSI does not currently possess an FCL, and must be sponsored by a cleared company in order to obtain an FCL. Per the NISPOM, TSI cannot apply for its own FCL, but TSI promptly provided all required information to AQuate in August 2012, so that AQuate could request on TSI's behalf that TSI receive an FCL.

29. AQuate was well aware at the time the Subcontract was executed that TSI did not possess an FCL, and would rely entirely on AQuate for FCL sponsorship.

30. The Subcontract also contained a Non-Solicitation of Personnel clause in Section G.8, which provided that:

> During the term of this Agreement and for 1 year thereafter, neither party will solicit personnel of the other party directly involved in the performance of this Agreement for the purpose of inducing them to join their employ. This provision does not prohibit the placement of help wanted advertisements in newspapers or other trade publications, but written consent of the other party shall be required before hiring anyone subject to this clause.

31. Following execution of the Subcontract, TSI began performing the transition work necessary to mobilize its employees for performance upon the SBX-1.

32. As part of its transition work, TSI executed employment letters with Cliff Bruner, Jayme Barlow, John Taft, and John Thiel. These TSI employees filled out W-2 and direct deposit forms for TSI, received physicals and drug tests coordinated by TSI, obtained clearance approval, and had any necessary passport costs covered by TSI. *See* Employment Documents, **Exhibit F**.

### The SBX-1 Bid Protest

33. In late August 2012, the award of the Prime Contract was protested before the Government Accountability Office (the "Protest"), as a result of which MSC issued a stop work order.

34. As a result of the stop work order, payment to AQuate, and thus to TSI, was temporarily suspended.

35. On November 26, 2012, the Protest was denied, and the stop work order was rescinded.

36. Following rescission of the stop work order, TSI resumed the transition steps to mobilize its employees to begin performance on the SBX-1, and is currently prepared to provide all personnel as required by the Subcontract, all possessing the requisite training and PCLs pursuant to the Prime Contract.

### AQuate's FCL Sponsorship Delays

37. Despite having received its DD-254 on August 23, 2012, as of December 3, 2012, AQuate had yet to sponsor TSI for an FCL.

38. Clearly impatient with AQuate's inexcusable delay, on December 4, 2012, MSC directed AQuate to complete the steps necessary to sponsor TSI for an FCL. Even then, AQuate waited an additional two weeks before submitting its sponsorship letter on December 18, 2012.

39. Pending a final determination on its application for an FCL, TSI took the initiative to seek an interim FCL, necessitated by AQuate's failure to timely provide sponsorship.

### AQuate's Notice of Default

40. On January 15, 2013, TSI received the **Exhibit G** Notice of Default and Termination of Subcontract N00033-12-001 and Stop Work Order under FAR 52.242-15

("Notice of Default") from AQuate, in which AQuate alleges that TSI is in breach of contract for failure to possess an FCL.

41. In its Notice of Default, AQuate alleges that TSI is in breach of the Subcontract for failure to possess an FCL, thereby preventing it from being able to perform its obligations to provide security personnel.

42. AQuate offered TSI two options: (1) TSI could cure its alleged default within fifteen (15) days, by January 30, 2013; or (2) TSI could waive Section G.8 of the Subcontract, regarding the non-solicitation of personnel.

43. If TSI were to waive Section G.8, AQuate would be able to solicit and directly employ the current TSI employees which TSI plans to provide in fulfillment of its obligations under the Subcontract, thereby depriving TSI of its employees and interfering with its ability to fulfill the terms of the Subcontract.

### AQuate's Defamatory Email and Solicitation of Employees

44. On January 16, 2013, AQuate sent the **Exhibit H** email (the "Email"), on which two TSI employees were carbon-copied.

45. The Email informed recipients, including one TSI employee whom TSI intended to use to staff the SBX-1 opportunity, that TSI had an "inability" to obtain an FCL.

46. As TSI requires access to classified information under the SBX-1 opportunity, is a company organized and existing under the laws of the state of Delaware, and is not under FOCI, the only reason TSI would be "unable" to obtain an FCL is if it does not have a reputation for integrity and lawful conduct in its business dealings.

47. On information and belief, AQuate has contacted TSI employees and informed them that, while AQuate cannot directly solicit said TSI employees for employment with

AQuate, AQuate may offer them employment if the TSI employees themselves reach out to AQuate instead.

48. On information and belief, AQuate has encouraged TSI employee Cliff Bruner to solicit other TSI employees on AQuate's behalf.

49. On information and belief, at least three TSI employees have been indirectly solicited by AQuate via Cliff Bruner.

50. On information and belief, at least three TSI employee indirectly solicited by AQuate has stated that they are now employed by AQuate. Cliff Bruner was directly solicited by AQuate and has stated he is now employed by AQuate.

51. TSI has not provided written consent to AQuate waiving the Non-Solicitation of Personnel clause and thereby granting AQuate permission to hire TSI employees directly involved in the performance of the Subcontract.

## AQuate's Non-Payment

52. Pursuant to the payment schedule, revived upon receipt of the start work order and amended to account for the ninety day protest period, payment to TSI was due on January 5, 2013 and January 19, 2013.

53. Payment under the Subcontract was due on a set schedule; it was not contingent upon work performed.

54. TSI has yet to be paid the payments due on January 5, 2013 and January 19, 2013.

## CAUSES OF ACTION

### COUNT ONE
### Breach of Contract

11

55. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 54 of the Verified Complaint as though fully set forth herein.

56. The firm-fixed price amounts of $1,125,169.44 if operating at LTSS status, and $2,127,154.30 if operating under SSL-A requirements, were offered by AQuate as part of an agreement between TSI and AQuate to engage TSI as a subcontractor during AQuate's performance of the Prime Contract.

57. The offer was accepted by TSI when it executed the Subcontract.

58. AQuate has actively prevented TSI from obtaining an FCL through its unreasonable delay in submitting the sponsorship paperwork required pursuant to the NISPOM to be submitted by the prime contractor on behalf of its subcontractor on classified contracts.

59. TSI has performed its remaining obligations under the Subcontract to date.

60. AQuate's termination of the Subcontract is in breach of Section H.3, which provides for termination if "Subcontractor fails to substantially fulfill any of its obligations hereunder...."

61. As a result, TSI has sustained substantial monetary damages.

## COUNT TWO
## Tortious Interference with a Contract

62. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 54 of the Verified Complaint as though fully set forth herein.

63. AQuate was aware of the existence of contracts (the "Employment Contracts) between TSI and the employees TSI intended to provide to fulfill its obligations under the Subcontract.

64. AQuate intentionally sought to procure a breach of said Employment Contracts by soliciting TSI employees to leave the employ of TSI to work directly for AQuate on the SBX-1 opportunity.

65. TSI has not waived the Non-Solicitation of Personnel provision in the Subcontract.

66. AQuate's actions were in violation of Section G.8 of the Subcontract.

67. As a result, TSI has sustained monetary damages.

## COUNT THREE
### Defamation

68. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 52 of the Verified Complaint as though fully set forth herein.

69. The Email published by AQuate to TSI employees and other parties was patently false and defamatory, as TSI is in fact able to receive an FCL and is being processed, on an expedited basis per MSC request to the Defense Security Service, for an interim FCL pending final investigation of the application submitted on TSI's behalf by AQuate.

70. AQuate made the defamatory statement with actual malice, i.e. with knowledge of its falsity or with reckless disregard thereof, and with the intent to injure, debase, and defame TSI; in the alternative, AQuate made the defamatory statement without due care to the identification of falsity.

71. As a direct and proximate result of the publication of the untrue and defamatory statement by AQuate, TSI's reputation as of integrity and ethnical business conduct has been damaged.

72. As a direct and proximate result of the publication of the untrue and defamatory statement by AQuate, TSI has been embarrassed and humiliated in front of its employees.

## **PRAYER FOR RELIEF**

Wherefore, plaintiff prays for the following relief:

1. Compensatory and consequential damages to Plaintiff's business and property, including but not limited to, lost or reduced profits, in an amount to be determined by the Court in its discretion, but at least in excess of $1,125,169.44 owing to the acts and omissions of the Defendant;

2. An additional amount to be determined by the Court in its discretion for the substantial and irreparable loss of goodwill and business opportunity with employees and customers suffered by Plaintiff as a result of the acts and omissions of the Defendant;

3. Exemplary and/or punitive damages for the Defendant's intentional, willful, wanton, outrageous, or malicious conduct, characterized by its ill will and intent to injure the Plaintiff; or the Defendant's gross recklessness or gross negligence evincing a conscious disregard for Plaintiff's rights;

4. Equitable relief as might be appropriate pursuant to applicable law, including but not limited to enjoining Defendant from continuing to malign Plaintiff's reputation with false statements;

5. Reasonable attorneys' fees and costs; and

6. Any other and further relief as this Court in its discretion deems just and appropriate.

Dated: January 18, 2013                      Respectfully submitted,

/s/ Hugh P. Quinn

Hugh P. Quinn
VSB No. 33364
*Counsel for Plaintiff Team Systems International, LLC*
Fluet Huber + Hoang, PLLC
1660 Duke Street, Suite 201
Alexandria, VA 22314
Telephone: (703) 590-1234
Facsimile: (571) 483-3657
hquinn@fluetlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on _Jan 2/25_, 2013, I filed the foregoing via _private process server_ to:

J. Dale Gipson, Esq.
*Counsel for Defendant AQuate, Corporation.*
LANIER FORD LLP
2101 West Clinton Avenue
Suite 102
Huntsville, AL 35805
(256) 535-1100
(256) 533-9322 (fax)

_____
Hugh P. Quinn
VSB No. 33364
*Counsel for Plaintiff Team Systems
International, LLC*
Fluet Huber + Hoang, PLLC
1660 Duke Street, Suite 201
Alexandria, VA 22314
Telephone: (703) 590-1234
Facsimile: (571) 483-3657
hquinn@fluetlaw.com

16

1

## VERIFICATION OF COMPLAINT

I, Deborah Evans Mott, hereby declare as follows:

1. I am a principal of Team Systems International, LLC.
2. I have personal knowledge of TSI and its activities, including those set out in the foregoing Verified Complaint, and if called to testify I would competently testify as to those matters stated herein.
3. I verify under penalty of perjury under the laws of the United States of America that I have read the foregoing Verified Complaint and know the contents thereof, and that the factual statements in the foregoing Verified Complain are true and correct to my own knowledge.

Executed this  25th  day of January, 2013.

*Deborah Evans Mott*
_____
Deborah Evans Mott

4841-9501-5698, v. 3

1